# In the United States Court of Federal Claims

**No. 21-1391C**
**Filed: October 20, 2021**
**Redacted Version Issued for Publication: November 7, 2021[1]**

* * * * * * * * * * * * * * * * *   *

| | |
|---|---|
| **GOODWILL INDUSTRIES OF SOUTH FLORIDA, INC.,** | * |
| | * |
| **Protestor,** | * |
| **v.** | * |
| | * |
| **UNITED STATES,** | * |
| | * |
| **Defendant.** | * |

* * * * * * * * * * * * * * * * *   *

      **Alan M. Grayson,** Windermere, FL for protestor.

      **Eric E. Laufgraben**, Department of Justice, Washington, DC, Trial Attorney, Commercial Litigation Branch, Civil Division, for defendant. With him were **Steven J. Gillingham,** Assistant Director, Commercial Litigation Branch, **Martin F. Hockey, Jr.**, Acting Director, Commercial Litigation Branch, and **Brian M. Boynton**, Acting Assistant Attorney General, Civil Division. **Allison Colsey Eck,** Defense Logistics Agency, Troop Support, of counsel.

## O P I N I O N

### HORN, J.

      In the above-captioned pre-award bid protest, protestor Goodwill Industries of South Florida, Inc. (Goodwill) filed a protest to "enjoin the award or continued performance of any federal contract or contracts, or the modification of any federal contract or contracts, awarded to or performed by entities other than Goodwill, for the production (in whole or in part) of military equipment items known as" Army Combat Pants and Army Hot-Weather Trousers. Goodwill further contends that it is the "mandatory source of supply for" the Army Combat Pants and Army Hot-Weather Trousers and the government's "procurement of the Goodwill items from any source other than Goodwill is a violation of procurement statutes and regulations." Therefore, protestor argues, "as a matter of law, the presence of the Hot-Weather Trousers and the Combat Pants on the

---

[1] This Opinion was issued under seal on October 20, 2021. The parties were asked to propose redactions prior to public release of the Opinion. This Opinion is issued with the redactions that the parties proposed in response to the court's request. Words which are redacted are reflected with the notation: "[redacted]."

Procurement List requires that every federal agency, including DLA, purchase these items from Goodwill."

## FINDINGS OF FACT

Javits-Wagner-O'Day Act and Implementing Regulations

Protestor Goodwill is a "qualified nonprofit agency for other severely disabled" workers. See 41 U.S.C. § 8501(6) (2018). This definition is significant because it allows Goodwill to produce products and services on a non-competitive basis. Defendant explains that "[r]elevant to this case are non-competitive procurements pursuant to the JWOD Act [Javits-Wagner-O'Day Act]. 41 U.S.C. ch. 85. The JWOD Act established the AbilityOne program whereby agencies must procure designated products and services on a non-competitive basis from qualified nonprofit agencies that provide employment opportunities for blind individuals or individuals with severe disabilities." The JWOD Act is titled: "Committee for Purchase from People Who Are Blind or Severely Disabled." 41 U.S.C. §§ 8501-06 (2018). The JWOD Act lists the purpose of the Act as "[t]o create a Committee on Purchases of Blind-made Products, and for other purposes." U.S. Statutes at Large, 75 Cong. Ch. 697, June 25, 1938, 52 Stat. 1196 (June 25, 1938). The Committee is now known as the U.S. AbilityOne Program.[2]

The regulations implementing the JWOD Act explain that

(a) It is the policy of the Government to increase employment and training opportunities for persons who are blind or have other severe disabilities through the purchase of commodities and services from qualified nonprofit agencies employing persons who are blind or have other severe disabilities. The Committee for Purchase from People who are Blind or Severely Disabled (hereinafter the Committee) was established by the Javits–Wagner—O'Day Act, Public Law 92–28, 85 Stat. 77 (1971), as amended, 41 U.S.C. 46–48c (hereinafter the JWOD Act). The Committee is responsible for implementation of a comprehensive program designed to enforce this policy.

---

[2] As explained in a notice filed in the Federal Register:

The Committee for Purchase From People Who Are Blind or Severely Disabled (the Committee) has deliberated and voted to change the name of the JWOD Program to the AbilityOne Program. The name of the program is being changed to AbilityOne to give a stronger, more unified identity to the program and to show a connection between the program name and the abilities of those who are blind or have other severe disabilities

AbilityOne Program, 71 Fed. Reg. 68492-01 (Nov. 27, 2006).

(b) It is the policy of the Committee to encourage all Federal entities and employees to provide the necessary support to ensure that the JWOD Act is implemented in an effective manner. This support includes purchase of products and services published on the Committee's Procurement List through appropriate channels from nonprofit agencies employing persons who are blind or have other severe disabilities designated by the Committee; recommendations to the Committee of new commodities and services suitable for addition to the Procurement List; and cooperation with the Committee and the central nonprofit agencies in the provision of such data as the Committee may decide is necessary to determine suitability for addition to the Procurement List.

41 C.F.R. § 51-1.1 (2021).[3] The regulations implementing the JWOD Act additionally explain that the "AbilityOne Program means the program authorized by the JWOD Act to increase employment and training opportunities for persons who are blind or have other severe disabilities through Government purchasing of commodities and services from nonprofit agencies employing these person." 41 C.F.R. § 51-1.3 (2021). Defendant notes that "[o]ver 500 nonprofit agencies participate in the [U.S.] AbilityOne program and their activities are coordinated through two centralized nonprofit agencies: SourceAmerica coordinates nonprofit agencies that employ severely disabled individuals; and the National Institute for the Blind coordinates nonprofit that employ blind individuals," and that "[t]he United States currently purchases over $4 billion in goods and services per year through the [U.S.] AbilityOne program."

The Code of Federal Regulations explains that

[t]he Committee is responsible for carrying out the following functions in support of its mission of providing employment and training opportunities for persons who are blind or have other severe disabilities and, whenever possible, preparing those individuals to engage in competitive employment:

(a) Establish rules, regulations, and policies to assure effective implementation of the JWOD Act.

(b) Determine which commodities and services procured by the Federal Government are suitable to be furnished by qualified nonprofit agencies

---

[3] The definitions in the JWOD Act explain that

[t]he terms "entity of the Federal Government" and "Federal Government" include an entity of the legislative or judicial branch, a military department or executive agency (as defined in sections 102 and 105 of title 5, respectively) , the United States Postal Service, and a nonappropriated fund instrumentality under the jurisdiction of the Armed Forces.

41 U.S.C. § 8501 (2018).

employing persons who are blind or have other severe disabilities and add those items to the Committee's Procurement List. Publish notices of addition to the Procurement List in the Federal Register. Disseminate information on Procurement List items to Federal agencies. Delete items no longer suitable to be furnished by nonprofit agencies. Authorize and deauthorize central nonprofit agencies and nonprofit agencies to accept orders from contracting activities for the furnishing of specific commodities and services on the Procurement List.

(c) Determine fair market prices for items added to the Procurement List and revise those prices in accordance with changing market conditions to assure that the prices established are reflective of the market.

(d) Monitor nonprofit agency compliance with Committee regulations and procedures.

(e) Inform Federal agencies about the AbilityOne Program and the statutory mandate that items on the Procurement List be purchased from qualified nonprofit agencies, and encourage and assist entities of the Federal Government to identify additional commodities and services that can be purchased from qualified nonprofit agencies. To the extent possible, monitor Federal agencies' compliance with JWOD requirements.

(f) Designate, set appropriate ceilings on fee paid to these central nonprofit agencies by nonprofit agencies selling items under the AbilityOne Program, and provide guidance to central nonprofit agencies engaged in facilitating the distribution of Government orders and helping State and private nonprofit agencies participate in the AbilityOne Program.

(g) Conduct a continuing study and evaluation of its activities under the JWOD Act for the purpose of assuring effective and efficient administration of the JWOD Act. The Committee may study, independently, or in cooperation with other public or nonprofit private agencies, problems relating to:

> (1) The employment of the blind or individuals with other severe disabilities.
> (2) The development and adaptation of production methods which would enable a greater utilization of these individuals.

(h) Provide technical assistance to the central nonprofit agencies and the nonprofit agencies to contribute to the successful implementation of the JWOD Act.

(i) Assure that nonprofit agencies employing persons who are blind will have priority over nonprofit agencies employing persons with severe disabilities in furnishing commodities.

41 C.F.R. § 51-2.2 (2021). The JWOD Act explains that for the Procurement List, referenced in 41 C.F.R. § 51-2.2:

**(a) Procurement list.**--

**(1) Maintenance of list.**--The Committee shall maintain and publish in the Federal Register a procurement list. The list shall include the following products and services determined by the Committee to be suitable for the Federal Government to procure pursuant to this chapter:

**(A)** Products produced by a qualified nonprofit agency for the blind or by a qualified nonprofit agency for other severely disabled.

**(B)** The services those agencies provide.

**(2) Changes to list.**--The Committee may, by rule made in accordance with the requirements of section 553(b) to (e) of title 5, add to and remove from the procurement list products so produced and services so provided.

41 U.S.C. § 8503(a) (2018) (emphasis in original). The JWOD Act also explains that

[a]n entity of the Federal Government intending to procure a product or service on the procurement list referred to in section 8503 of this title shall procure the product or service from a qualified nonprofit agency for the blind or a qualified nonprofit agency for other severely disabled in accordance with regulations of the Committee and at the price the Committee establishes if the product or service is available within the period required by the entity.

41 U.S.C. § 8504 (2018).The implementing regulations define the Procurement List as "a list of commodities (including military resale commodities) and services which the Committee has determined to be suitable to be furnished to the Government by nonprofit agencies for the blind or nonprofit agencies employing persons with severe disabilities pursuant to the JWOD Act and these regulations." 41 C.F.R. § 51-1.3 (2021). The implementing regulations also explain that the JWOD Act has a statutory mandate to purchase from the Procurement List:

a) Nonprofit agencies designated by the Committee are mandatory sources of supply for all entities of the Government for commodities and services included on the Procurement List, as provided in § 51–1.2 of this chapter.

(b) Purchases of commodities on the Procurement List by entities of the Government shall be made from sources authorized by the Committee. These sources may include nonprofit agencies, central nonprofit agencies, Government central supply agencies such as the Defense Logistics Agency and the General Services Administration, and certain commercial distributors. Identification of the authorized sources for a particular commodity may be obtained from the central nonprofit agencies at the addresses noted in § 51–6.2 of this chapter.

(c) Contracting activities shall require other persons providing commodities which are on the Procurement List to entities of the Government by contract to order these commodities from the sources authorized by the Committee.

(d) Procedures for obtaining military resale commodities are contained in § 51–6.4 of this chapter.

(e) Contracting activities procuring services which have included within them services on the Procurement List shall require their contractors for the larger service requirement to procure the included Procurement List services from nonprofit agencies designated by the Committee.

41 C.F.R. § 51-5.2 (2021). Therefore, pursuant to the JWOD Act and also the implementing regulations, there is a "statutory mandate that items on the Procurement List be purchased from qualified nonprofit agencies." 41 C.F.R. § 51-2.2. According to the statute, the "Committee shall maintain and publish in the Federal Register a procurement list," and the Procurement List includes "products and services determined by the Committee to be suitable for the Federal Government to procure." 41 U.S.C. § 8503(a).

The implementing regulations at 41 C.F.R. § 51-5.3 describe the "Scope of requirement" for an item on the Procurement List:

(a) When a commodity is included on the Procurement List, the mandatory source requirement covers the National Stock Number or item designation listed and commodities that are essentially the same as the listed item. In some instances, only a portion of the Government requirement for a National Stock Number or item designation is specified by the Procurement List. Where geographic areas, quantities, percentages or specific supply locations for a commodity are listed, the mandatory provisions of the JWOD Act apply only to the portion or portions of the commodity indicated by the Procurement List.

(b) For services, where an agency and location or geographic area are listed on the Procurement List, only the service for the location or geographic area listed must be procured from the nonprofit agency, except as provided in § 51–6.14 of this chapter. Where no location or geographic area is indicated

by the Procurement List, it is mandatory that the total Government requirement for that service be procured from a nonprofit agency.

(c) When a commodity or service is added to the Procurement List, the addition does not affect contracts for the commodity or service awarded prior to the effective date of the Procurement List addition or options exercised under those contracts.

41 C.F.R. § 51-5.3 (2021). The regulations at 41 C.F.R. § 51-6.13 also provided that

(a) When a commodity on the Procurement List is replaced by another commodity which has not been recently procured, and a nonprofit agency can furnish the replacement commodity in accordance with the Government's quality standards and delivery schedules, the replacement commodity is automatically considered to be on the Procurement List and shall be procured from the nonprofit agency designated by the Committee at the fair market price the Committee has set for the replacement commodity. The commodity being replaced shall continue to be included on the Procurement List until there is no longer a Government requirement for that commodity.

(b) If contracting activities desire to procure additional sizes, colors, or other variations of a commodity after the commodity is added to the Procurement List, and these similar commodities have not recently been procured, these commodities are also automatically considered to be on the Procurement List.

(c) In accordance with § 51–5.3 of this chapter, contracting activities are not permitted to purchase commercial items that are essentially the same as commodities on the Procurement List.

41 C.F.R. § 51-6.13 (2021).


U.S. AbilityOne Designations

On August 27, 2010, U.S. AbilityOne added to the Procurement List a series of national stock numbers associated with the Multi- Camouflage Trouser. See Procurement List Additions, 75 Fed. Reg. 52,724, 52,725 (Aug. 27, 2010). The addition stated, in part:

NPAs: ReadyOne Industries, Inc., El Paso, TX

Goodwill Industries of South Florida, Inc., Miami, FL

Contracting Activity: Department of the Army Research, Development, & Engineering Command, Natick, MA.

Coverage: C-List for 50% of the requirement of the U.S. Army, as aggregated by the Department of the Army Research, Development, & Engineering Command, Natick, MA.

Id.

Defendant explains that "[a]fter adding 50% of the Army's requirement for multi-cam trousers for purchase by Army-Natick, the Commission extended that requirement to additional products, either as replacement items (*e.g.,* combat pants) or as new national stock numbers (*e.g.,* female hot weather trousers)," and defendant notes that "[a]ll items stemming from the Commission's addition of the multi-cam trousers in 2010 are identified in the administrative record under PL No. 20105144." (emphasis in original). Protestor notes that the "Hot-Weather Trousers NSNs were not added to the Procurement List all at once, but rather, over time." The parties agree that the Army Combat Pants and the Army Hot-Weather Trousers are on the Procurement List.

By way of example, on September 12, 2011, the Committee for Purchase from People who are Blind or Severely Disabled, sent a Notice of Change to Procurement List to the Army Contracting Command - Aberdeen Proving Ground, Natick Contracting Division. The Notice of Change stated: "In accordance with 41 CFR 51-6.13 (a), the Committee for Purchase From People Who Are Blind or Severely Disabled has approved the establishment of the following replacement products on the Procurement List at the prices indicated," and listed a series of Army Combat Pants with the product name, NSN, price, and relevant information. The Notice of Change, as it applies to the Army Combat Pants, stated:

Product Name/NSN: Pants, Army Combat (ACP), OCP, XXL-L / 8415-MD-001-0303
Product Description: Temperate climate combat pants for Army Combat Uniform, in OCP camouflage with FR and Permethrin. UOI is PR.
Price Mech: Negotiated
Price Category/Unit of Issue: Normal/PR
FOB-Origin Price: $191.76
FOB-Destination Price: $192.36
PL Designation: C List

The Notice of Change to Procurement List concluded:

Coverage: C-List for 50% of the requirement of the U.S. Army, as aggregated by the Army Contracting Command – Aberdeen Proving Ground, Natick Contracting Division, Natick, MA

ReadyOne Industries, Inc., El Paso, TX, a nonprofit agency associated with NISH, is authorized to accept orders from the Army Contracting Command

8

– Aberdeen Proving Ground, Natick Contracting Division, Natick, MA for its requirement for the products listed above.

Goodwill Industries of South Florida, Inc., Miami, FL, a nonprofit agency associated with NISH, is authorized to accept orders from the Army Contracting Command – Aberdeen Proving Ground, Natick Contracting Division, Natick, MA for its requirement for the products listed above.

Prices are effective on the date of this Notice and apply to any orders received by the nonprofit agencies on or after those dates. Future prices will be determined according to the price change mechanism indicated.

More recently, on January 11, 2021, U.S. AbilityOne Commission sent a Notice of Addition to the Procurement List for the Army Contracting Command - Aberdeen Proving Ground, Natick Contracting Division. The Notice of Addition stated in its entirety:

In accordance with 41 CFR 51-6.13(b), the U.S. AbilityOne Commission (Commission) has determined that the following products are additional sizes, colors, or other variations of products already on the Procurement List (PL) and that these products have not recently been procured. Accordingly, the products are automatically considered to be on the PL [Procurement List] at the Fair Market Prices (FMP) indicated

**Product Name:**   Trouser, Improved Hot Weather Combat Uniform (IHWCU), Permethrin, Women's, Army

| **Product NSN** | **Size** |
| --- | --- |
| 8415-01-687-6651 | 25-X Short |
| 8415-01-687-6669 | 25-Short |
| 8415-01-687-3100 | 25-Regular |
| 8415-01-687-6659 | 28-A Short |
| 8415-01-687-6201 | 28-Short |
| 8415-01-687-6555 | 28-Regular |
| 8415-01-687-6180 | 28-Long |
| 8415-01-687-1971 | 31-X Short |
| 8415-01-687-1339 | 31-Short |
| 8415-01-687-1353 | 31-Regular |
| 8415-01-687-6673 | 31-Long |
| 8415-01-687-2126 | 31-X Long |
| 8415-01-687-6147 | 35-Short |
| 8415-01-687-2060 | 35-Regular |
| 8415-01-687-1345 | 35-Long |
| 8415-01-687-4018 | 35-X Long |

The following information is applicable to all products listed above

**Product Description:** The Improved Hot Weather Combat Uniform (IHWCU) trouser has one (1) button/buttonhole closure with seven (7) belt loops along with a covered fly with three (3) buttons and buttonhole closure, two (2) side hanging pockets, two (2) front side pleated cargo pockets with three (3) buttons/two (2) buttonholes closure flaps. The trousers include a double needle seat patch and knee reinforcement patches and a mesh fabric attached on the inside of the trousers at the bottom of the legs as inner cuffs. Both the bottom of the trousers legs and the inner cuffs have drawstrings. The trouser is treated with permethrin, wind resistant, and wrinkle free. UOI is PR.

**Unit of issue:** PR
**FMP Category:** Post Treated Garment - Rapid Fielding
**FMP Change Mechanism:** Negotiated
**FOB Origin FMP:** $62.34
**FOB Destination FMP:** $62.50

In accordance with 41 51 CFR 51-2.7, change to the FMP outside of the approved methodology above and provisions in the U.S. AbilityOne Pricing Policy 51.610, *Pricing AbilityOne Products*, must be approved by the Commission before a contract is awarded or an existing contract is modified.

**Distribution:** C-List

**Contracting Activity:** Army Contracting Command - Aberdeen Proving Ground, Natick Contracting Division

**Mandatory for:** 50% of the requirement of the Department of Defense[4]

**Designated Source of Supply:** Goodwill Industries of South Florida, Inc., Miami, FL, a nonprofit agency associated with SourceAmerica, is authorized to accept orders for the products listed above.

This addition to the Procurement List is effective the date of this notice. In accordance with 41 CFR 51-5.3, this change does not affect contracts for the product awarded prior to the effective date of the Procurement List addition or options exercised under those contracts. Please direct questions regarding this Notice to Operations@abilityone.gov.

---

[4] The defendant in its motion for judgment on the Administrative Record contends that "[t]he Commission recently identified this provision as erroneous because the requirement applies to '50% of the requirement of the U.S. Army.' The Commission intends to issue a correction."

(capitalization and emphasis in original).[5]

As noted above, Goodwill is a "qualified nonprofit agency for other severely disabled" workers. Protestor argues that "[a]ccording to the Procurement List maintained by the Committee for Purchase from People Who Are Blind or Severely Disabled a/k/a AbilityOne, Goodwill is the mandatory source of supply for the Combat Pants and the Hot-Weather Trousers." (internal reference omitted). Protestor's complaint indicates that "Goodwill has received, has performed, and is performing military contracts for the Goodwill items. Goodwill has been producing the ACP [Army Combat Pants] for a decade."[6] Protestor also alleges that "Goodwill also has received Contract No. W911QY-21-C-0042, to supply the Women's IHWCU Trousers," and both "[t]he ACP and the Women's IHWCU Trousers are in production at Goodwill." The government agrees, indicating "[a]fter the Commission allocated a portion of Army-Natick's requirement for combat pants to the Procurement List, Army-Natick issued a series of product development contracts to Goodwill," and notes that the "Army-Natick's most-recent contract with Goodwill called for 68,991 pants to be delivered in monthly installments in quantities ranging from 2,000 to 6,370," and the "Army-Natick also entered into a contract with Goodwill to produce the female hot weather trousers to support its product development efforts." The government indicates that "[w]hen Army-Natick proposed to add a portion of its requirement to the Procurement List, its estimated annual quantity was 86,688 trousers."

DLA Procurements

The government explains that "DLA is a 'defense agency' under the authority, direction, and control of the Department of Defense." (citing 10 U.S.C. §§ 191-92; Dep't of Defense Directive (DoDD) 5105.22 (June 29, 2017)). The government also indicates that:

The agency's primary mission is to "manage[s] the global supply chain—from raw materials to end user to disposition—for the Army, Marine Corps, Navy, Air Force, Space Force, Coast Guard, 11 combatant commands, other federal agencies, and partner and allied nations." DLA Troop Support requirements are unique given that it is responsible for "manag[ing] the

---

[5] Protestor's complaint alleges the same notice was provided to Goodwill in a letter from AbilityOne on April 8, 2021. The Administrative Record also includes a Notice of Addition to the Procurement List for the Army Contracting Command - Aberdeen Proving Ground, Natick Contracting Division similarly dated April 8, 2021. The April 8, 2021 Notice of Addition to the Procurement List changed a single Product NSN: 8415-01-687-6555, and noted: "**Product Name:** Trouser, Improved Hot Weather Combat Uniform (IHWCU), Permethrin, Women's, Army, 28-Regular." (capitalization and emphasis in original).

[6] Protestor identifies the following Combat Pants contract Goodwill has performed: W911QY-11-F-0170; W911QY-12-F-0095; W911QY-14-F-0067; W911QY-14-F-0136; W911QY-18-C-0115; W911QY-20-C-0024."

supply chains for food, textiles, construction material, industrial hardware and medical supplies and equipment, including pharmaceuticals." Within DLA Troop Support, the clothing and textiles supply chain "outfit[s] every soldier, sailor, airman and Marine around the world, from their first day of service in boot camp, to camouflage uniforms worn on the battlefield and service dress uniforms."

(citations omitted). The Code of Federal Regulations at 48 C.F.R. § 8.703 notes that "GSA, DLA, and VA are central supply agencies from which other Federal agencies are required to purchase certain supply items on the Procurement List." 48 C.F.R. § 8.703 (2021). Defendant contends that "[h]aving completed the technical design of the combat pants and female hot weather trousers, Army-Natick transferred these products to DLA Troop Support for procurement at sustainment levels."

*Army Hot-Weather Trousers*

The government explained "DLA Troop Support intends to award two IDIQ contracts—one restricted to small businesses, the other restricted to HUBZone businesses—to procure the female hot weather trousers, and to select contractors based on best value." DLA has not yet issued the solicitation for Army Hot-Weather Trousers. DLA, however, has drafted the Individual Acquisition Plan for the Army Hot-Weather Trousers, and the Individual Acquisition Plan explained:

The solicitation will result in the award of two Fixed Price Indefinite-Delivery, Indefinite-Quantity (IDIQ)-type contracts for a minimum and maximum as detailed below. Individual delivery orders will be placed based on the Government's need for the items. The contracts will have a lead-time of 180 days for the initial orders and 150 days for subsequent orders.

The Individual Acquisition Plan for the Army Hot-Weather Trousers stated that

[t]he quantities available and set-asides are based on the results of market research. The quantities available fall within the range of minimum/estimated/maximum production quantity results received as part of market research. Lots were designed to be small enough in order to allow for maximum participation by small businesses, and to ensure that multiple sources are available to provide for the continuous availability of reliable sources of supplies.

The Individual Acquisition Plan for the Army Hot-Weather Trousers continued:

The solicitation will be evaluated utilizing the Best Value Trade-off Source Selection Method. The Government will make award to the responsible offeror(s) whose offer conforms to the solicitation and is most advantageous to the Government, cost or price, and other evaluation factors considered. The Government will award the contract only to concerns whose technical

> proposal establish that they can meet the requirements of the Government. For this solicitation, all evaluation factors other than cost or price, when combined are significantly more important than cost or price. As other evaluation factors become more equal, the evaluated cost or price becomes more important.

(capitalization in original). The Individual Acquisition Plan for the Army Hot-Weather Trousers noted:

> Adequate competition is expected for this current requirement as DLA Troop Support received numerous responses to a market survey and has historically received numerous offers for similar items. Each lot is structured in response to the market survey, creating an expectation of at least two viable offers on each lot. Adequate competition necessary for price reasonableness determinations is expected.

*Army Combat Pants*

On January 28, 2021, the Defense Logistics Agency (DLA) issued a solicitation for Army Combat Pants. The Individual Acquisition Plan for the Army Combat Pants explained:

> The Government intends to award two Indefinite Delivery, Indefinite Quantity (IDIQ) Type Contracts (one for each Lot) to two different contractors. It is noted that in order to ensure that multiple sources are available for Advanced Combat Pants and to ensure the continuous availability of reliable sources of supplies, the Government reserves the right to exclude, under the authority of FAR 6.202, an awardee under one of these portions from being eligible for award under the other portion. Each resultant contract will contain a five (5) year ordering period with tiered pricing as detailed in bullet 2 above. This will permit the Government flexibility in delivery schedules and ordering/shipping as requirements materialize, with continuing access to the item on short notice as demand increases. This will also reduce cost in the areas of procurement, administration, and storage, rather than requiring large, pre-programmed, periodic deliveries to depot stock. In addition, a price analysis will be accomplished to determine if all five tier prices are fair and reasonable.

The Army Combat Pants solicitation indicated that "[t]he Government intends to make two separate awards for the Advanced Combat Pants; 50% Unrestricted and 50% Total Small Business Set-Aside." (capitalization in original). The solicitation continued:

> The award made under this solicitation will result in a firm-fixed price, indefinite delivery, indefinite quantity type contract that will have a five (5) year ordering period. Within the five (5) year ordering period, there will be five (5) tier periods. Acceptance of each of the five (5) tiers is mandatory.

13

> Offerors are to provide an offered price for each of the five (5) 12-month tier periods. Failure to indicate acceptance of each tier by providing a unit price for each below may be deemed as non-acceptance of the terms and conditions and may result in the rejection of the offeror's entire proposal.

The solicitation also explained that "[t]his acquisition is utilizing BEST VALUE TRADEOFF Source Selection Procedures, FAR 15.101-1. As such, the Government intends to make an award to the firm that demonstrates the greatest probability of success and that will perform in a manner which will nest [sic] meet the Governments [sic] stated requirements." (capitalization in original). Notably, as explained in the defendant's cross-motion for judgement on the Administrative Record, "the procurement is currently on hold because the Army is making technical changes to the combat pants' design specification." Once defendant decided to put the Army Combat Pants solicitation "on hold," DLA issued an amendment to the Army Combat Pants solicitation which stated:

> THIS SOLICITATION IS HEREBY EXTENDED INDEFINITELY. DLA IS WAITING FOR SPECIFICATION CHANGES TO THE PURCHASE DESCRIPTION AND TECHNICAL DATA. A SUBSEQUENT AMENDMENT WILL BE ISSUED WITH UPDATED TECHNICAL INFORMATION AND A NEW CLOSING DATE WILL BE ESTABLISHED.

(capitalization in original). The amendment provided no further information about what the specification changes would be or what additional technical data was required.

Procedural History

On May 24, 2021, Goodwill filed its bid protest complaint, which has three very similar counts. In count one, protestor "seeks injunctive relief prohibiting federal procurement of the Goodwill items" "from anyone other than Goodwill," in count two, Goodwill "seeks injunctive relief prohibiting DLA from procurement of the Goodwill items" "from anyone other than Goodwill," and in count three, protestor argues "[b]ecause Goodwill is the mandatory source of supply for the Goodwill items, if DLA can issue solicitations for the Goodwill items at all, DLA should require awardees under the Solicitations to acquire the Goodwill items from Goodwill. DLA has not done so. This violates 41 C.F.R. § 51-5.2." Therefore, Goodwill asks the court to enjoin "federal acquisition of the Goodwill items, and any replacement item or variation of the Goodwill items, and any item that is 'essentially the same' or 'similar,' from any source other than Goodwill."

The day after protestor filed the complaint the court held an initial hearing with the parties, and set a schedule for briefing cross-motions for the judgment on the Administrative Record. In protestor's motion for judgment on the Administrative Record, Goodwill argues that if an item is on the AbilityOne Procurement List, it creates a mandatory source of supply for the government, including DLA. Furthermore, according to protestor: "Goodwill maintains that as the mandatory source of supply, it should not have been required to submit a proposal to DLA in order to be awarded this requirement."

14

Goodwill also contends that "the presence of the Hot-Weather Trousers and the Combat Pants on the Procurement List requires that every federal agency, including DLA, purchase these items from Goodwill." In the defendant's cross-motion for judgment on the Administrative Record, defendant argues that "Goodwill cannot show that the solicitation violates an applicable procurement statute or regulation." Defendant argues that

> Goodwill's protest rises and falls on its argument that the addition of any product on the Procurement List is without limitation such that all portions of the Government must procure 100% of its requirements for that product through the AbilityOne program. But no procurement statute or regulation imposes that categorical mandate. On the contrary, at least three Commission regulations authorize the Commission to place scope limitations by adding portions of a product requirement to the Procurement List.

(internal reference omitted). Specifically, the government contends that "[t]he procurement list applies only to Army-Natick's procurements of 50% of Army requirements for Combat Pants and Female Hot Weather Trousers," and "[t]he Commission's 2006 clarification further demonstrates that DLA Troop Support is not bound to purchase the Combat Pants and Female Hot Weather Trousers through The AbilityOne Program." In protestor's reply brief, protestor again argues that the Army Combat Pants and the Army Hot-Weather Trousers "are on the Procurement List for all Agencies, Including DLA," and argues that "[t]he defendant has concocted a fictive regulatory scheme that is belied by governing statutes and regulations, as well as the facts of this case." After the parties fully briefed the cross-motions for judgment on the Administrative Record, the court held oral argument.

## DISCUSSION

As noted above, protestor Goodwill seeks to "enjoin the award or continued performance of any federal contract or contracts, or the modification of any federal contract or contracts, awarded to or performed by entities other than Goodwill, for the production (in whole or in part) of military equipment items known as" Army Combat Pants and Army Hot-Weather Trousers.

The court notes that "[s]ubject-matter jurisdiction may be challenged at any time by the parties or by the court sua sponte." Folden v. United States, 379 F.3d 1344, 1354 (Fed. Cir. 2004) (Fanning, Phillips & Molnar v. West, 160 F.3d 717, 720 (Fed. Cir. 1998)), reh'g and reh'g en banc denied (Fed. Cir. 2004), cert. denied, 545 U.S. 1127 (2005); see also St. Bernard Parish Gov't v. United States, 916 F.3d 987, 992-93 (Fed. Cir. 2019) ("[T]he court must address jurisdictional issues, even sua sponte, whenever those issues come to the court's attention, whether raised by a party or not, and even if the parties affirmatively urge the court to exercise jurisdiction over the case." (citing Foster v. Chatman, 136 S. Ct. 1737, 1745 (2016)); Int'l Elec. Tech. Corp. v. Hughes Aircraft Co., 476 F.3d 1329, 1330 (Fed. Cir. 2007); Haddad v. United States, 152 Fed. Cl. 1, 16 (2021); Fanelli v. United States, 146 Fed. Cl. 462, 466 (2020).

The United States Court of Appeals for the Federal Circuit has stated that the Court of Federal Claims' jurisdiction over "any alleged violation of statute or regulation in connection with a procurement or a proposed procurement," 28 U.S.C. § 1491(b)(1) (2018), "provides a broad grant of jurisdiction because '[p]rocurement includes *all stages of the process of acquiring property or services*, beginning with the process for determining a need for property or services and ending with contract completion and closeout.'" Sys. Application & Techs., Inc. v. United States, 691 F.3d 1374, 1381 (Fed. Cir. 2012) (emphasis in original) (quoting Res. Conservation Grp., LLC v. United States, 597 F.3d at 1244 (quoting 41 U.S.C. § 403(2))); see also Rockies Exp. Pipeline LLC v. Salazar, 730 F.3d 1330, 1336 (Fed. Cir. 2013), reh'g denied (Fed. Cir. 2014); Distrib. Solutions, Inc. v. United States, 539 F.3d 1340, 1346 (Fed. Cir.) ("[T]he phrase, 'in connection with a procurement or proposed procurement,' by definition involves a connection with any stage of the federal contracting acquisition process, including 'the process for determining a need for property or services.'"), reh'g denied (Fed. Cir. 2008); RAMCOR Servs. Grp., Inc. v. United States, 185 F.3d 1286, 1289 (Fed. Cir. 1999) ("The operative phrase 'in connection with' is very sweeping in scope."). Recently, a Judge of the United States Court of Federal Claims reiterated that

> the Federal Circuit has adopted the statutory definition of "procurement" found in 41 U.S.C. § 403(2), now codified at 41 U.S.C. § 111. Distributed Sols., Inc. v. United States, 539 F.3d 1340, 1345-46 (Fed. Cir. 2008). That statutory definition provides that "the term 'procurement' includes all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion and closeout." 41 U.S.C. § 111.

Squire Sols., Inc. v. United States, No. 21-1494C, 2021 WL 4805540, at *9 (Fed. Cl. Sept. 30, 2021).

As noted above, for the Army Hot-Weather Trousers, although the government has not issued a solicitation yet, DLA has identified the need for the Army Hot-Weather Trousers and has issued the Individual Acquisition Plan for the Army Hot-Weather Trousers. For the Army Combat Pants, DLA has issued the solicitation for the Army Combat Pants. For both items, therefore, DLA has, at a minimum, begun the process of acquiring property, and, therefore, this court has jurisdiction. See Distrib. Solutions, Inc. v. United States, 539 F.3d at 1346.

Although the court has jurisdiction under the Tucker Act for a procurement for the Army Hot-Weather Trousers and the Army Combat Pants, the court must still determine if protestor's allegations are ripe. Ripeness is a doctrine of justiciability that concerns the readiness of an issue for judicial review. See Abbott Labs. v. Gardner, 387 U.S. 136, 149 (1967), overruled on other grounds by Califano v. Sanders, 430 U.S. 99 (1977); see also Fisher v. United States, 402 F.3d 1167, 1176 (Fed. Cir. 2005). The ripeness doctrine "circumscribes the court's review to cases that present realized rather than anticipated or hypothetical injuries." Madison Servs., Inc. v. United States, 90 Fed. Cl. 673, 678 (2009). The purpose of the ripeness doctrine is "to prevent the courts, through avoidance of

16

premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." Abbott Labs. v. Gardner, 387 U.S. at 149; see also NSK Ltd. v. United States, 510 F.3d 1375, 1384 (Fed. Cir. 2007). In considering the justiciability of a bid protest, the United States Court of Appeals for the Federal Circuit has held, "[a] claim is not ripe for judicial review when it is contingent upon future events that may or may not occur." Sys. Application & Techs., Inc. v. United States, 691 F.3d 1374, 1383 (Fed. Cir. 2012). In the bid protest context, anticipation of a future procurement violation is not sufficient to make a claim ripe. See Brocade Commc'n Sys., Inc. v. United States, 120 Fed. Cl. 73, 79 (2015); see also Tenica & Assocs., LLC v. United States, 123 Fed. Cl. 166, 172 (2015). To assert ripeness, "there are two basic factors: '(1) the fitness of the issues for judicial decision[;] and (2) the hardship to the parties of withholding court consideration.'" See Sys. Application & Techs., Inc. v. United States, 691 F.3d at 1383-84 (quoting Abbott Labs. v. Gardner, 387 U.S. at 149); see also Caraco Pharm. Labs., Ltd. v. United States, 527 F.3d 1278, 1294-95 (Fed. Cir. 2008). "If a claim is not yet ripe for judicial review, it should generally be dismissed without prejudice." Shinnecock Indian Nation v. United States, 782 F.3d 1345, 1350 (Fed. Cir. 2015); see also Morris v. United States, 392 F.3d 1372, 1375 (Fed. Cir. 2004) (explaining that the Court of Federal Claims "does not have jurisdiction over claims that are not ripe"). It is protestor's burden to establish ripeness. See Harris Patriot Healthcare Sols., LLC v. United States, 95 Fed. Cl. 585, 596 n.17 (2010); see also Melwood Horticultural Training Ctr., Inc. v. United States, 151 Fed. Cl. 297, 307 (2020).

The first factor "becomes a question of whether the challenged conduct constitutes a final agency action." Sys. Application & Techs., Inc. v. United States, 691 F.3d at 1384; see also Jacobs Tech. Inc. v. United States, 131 Fed. Cl. 430, 446 (2017) ("First, with respect to fitness for judicial review, the court must determine 'whether the challenged conduct constitutes a final agency action.' Sys. Application & Techs., 691 F.3d at 1384."). "[A]n agency decision is not ripe for judicial review until the allegedly offending agency has adopted a final decision." See NSK Ltd. v. United States, 510 F.3d at 1384. To be considered final, an agency's decision must mark the consummation of the agency's decision-making process and cannot be tentative or interlocutory. See id.; see also Sys. Application & Techs., Inc. v. United States, 691 F.3d at 1384; Madison Servs., Inc. v. United States, 90 Fed. Cl. at 678. Also, the agency action must be one by which rights or obligations have been determined or from which legal consequences will flow. Sys. Application & Techs., Inc. v. United States, 691 F.3d at 1384.

Regarding the second factor, the hardship to the parties, the court considers whether withholding court consideration would have an "immediate and substantial impact" on the protestors. Caraco Pharm. Labs., Ltd. v. United States, 527 F.3d at 1295. "The role of the federal courts is to provide redress for injuries that are concrete in both a qualitative and temporal sense." See Shinnecock Indian Nation v. United States, 782 F.3d at 1351 (internal quotation omitted). "The mere possibility of harm is insufficient." Jacobs Tech. Inc. v. United States, 131 Fed. Cl. at 446. Similarly, "[a]bstract, avoidable or speculative harm is not enough to satisfy the hardship prong." Pernix Grp., Inc. v. United States, 121 Fed. Cl. 592, 599 (2015). "In the bid protest context, there is no measureable

hardship, at the time of the protest, flowing from a future, hypothetical agency decision adverse to the protestor." Id. "Unlike the standard for obtaining injunctive relief, which requires a showing of irreparable harm, the standard for ripeness requires a lesser showing of hardship." Sys. Application & Techs., Inc. v. United States, 691 F.3d at 1385.

For the Army Hot-Weather Trousers, defendant explained that "DLA Troop Support intends to award two IDIQ contracts—one restricted to small businesses, the other restricted to HUBZone businesses—to procure the female hot weather trousers, and to select contractors based on best value." Although DLA has drafted the Individual Acquisition Plan for the Army Hot-Weather Trousers, DLA has not yet issued the solicitation for the Army Hot-Weather Trousers. As noted above, the Individual Acquisition Plan explained:

> The solicitation will result in the award of two Fixed Price Indefinite-Delivery, Indefinite-Quantity (IDIQ)-type contracts for a minimum and maximum as detailed below. Individual delivery orders will be placed based on the Government's need for the items. The contracts will have a lead-time of 180 days for the initial orders and 150 days for subsequent orders.

The Individual Acquisition Plan for the Army Hot-Weather Trousers stated that

> [t]he quantities available and set-asides are based on the results of market research. The quantities available fall within the range of minimum/estimated/maximum production quantity results received as part of market research. Lots were designed to be small enough in order to allow for maximum participation by small businesses, and to ensure that multiple sources are available to provide for the continuous availability of reliable sources of supplies.

The Individual Acquisition Plan for the Army Hot-Weather Trousers continued:

> The solicitation will be evaluated utilizing the Best Value Trade-off Source Selection Method. The Government will make award to the responsible offeror(s) whose offer conforms to the solicitation and is most advantageous to the Government, cost or price, and other evaluation factors considered. The Government will award the contract only to concerns whose technical proposal establish that they can meet the requirements of the Government. For this solicitation, all evaluation factors other than cost or price, when combined are significantly more important than cost or price. As other evaluation factors become more equal, the evaluated cost or price becomes more important.

(capitalization in original).

DLA has given consideration to the type of procurement it intends to issue to acquire the Army Hot-Weather Trousers. DLA, however, has not yet issued the solicitation, and has indicated it may change further the method or approach to acquiring

the Army Hot-Weather Trousers. Although protestor seeks to enjoin the award or the performance of "any federal contract" for the Army Hot-Weather Trousers, for the DLA procurement of the Army Hot-Weather Trousers, no award has been made, and no final solicitation has been issued. Although protestor argues that the award of a contract to anyone other than Goodwill will be a violation of numerous statutes and regulations related to the Procurement List, the anticipation of a future procurement violation is not sufficient to make a claim ripe in a bid protest before the court. See Tenica & Assocs., LLC v. United States, 123 Fed. Cl. at 172; Brocade Commc'n Sys., Inc. v. United States, 120 Fed. Cl. at 79. Neither the court, nor protestor can definitely state what the terms of a solicitation for the Army Hot-Weather Trousers will be, or if Goodwill's position will be considered or implemented by DLA's final solicitation issuance. Similarly, although Goodwill claims future harm as a result of the failure to award the contracts for the Army Hot-Weather Trousers to Goodwill, until the issuance of, at a minimum, the specific terms of the solicitation, any harm to Goodwill remains attenuated.

Regarding the Army Combat Pants, the Individual Acquisition Plan for the Army Combat Pants explained:

> The Government intends to award two Indefinite Delivery, Indefinite Quantity (IDIQ) Type Contracts (one for each Lot) to two different contractors. It is noted that in order to ensure that multiple sources are available for Advanced Combat Pants and to ensure the continuous availability of reliable sources of supplies, the Government reserves the right to exclude, under the authority of FAR 6.202, an awardee under one of these portions from being eligible for award under the other portion. Each resultant contract will contain a five (5) year ordering period with tiered pricing as detailed in bullet 2 above. This will permit the Government flexibility in delivery schedules and ordering/shipping as requirements materialize, with continuing access to the item on short notice as demand increases. This will also reduce cost in the areas of procurement, administration, and storage, rather than requiring large, pre-programmed, periodic deliveries to depot stock. In addition, a price analysis will be accomplished to determine if all five tier prices are fair and reasonable.

(capitalization in original). Unlike the Army Hot-Weather Trousers, after the issuance of the Individual Acquisition Plan, DLA issued a solicitation for the Army Combat Pants but, as explained in the defendant's cross-motion for judgement on the Administrative Record, "the procurement is currently on hold because the Army is making technical changes to the combat pants' design specification." The Army Combat Pants solicitation indicated that "[t]he Government intends to make two separate awards for the Advanced Combat Pants; 50% Unrestricted and 50% Total Small Business Set-Aside." (capitalization in original). The Army Combat Pants solicitation continued:

> The award made under this solicitation will result in a firm-fixed price, indefinite delivery, indefinite quantity type contract that will have a five (5) year ordering period. Within the five (5) year ordering period, there will be five (5) tier periods. Acceptance of each of the five (5) tiers is mandatory.

Offerors are to provide an offered price for each of the five (5) 12-month tier periods. Failure to indicate acceptance of each tier by providing a unit price for each below may be deemed as non-acceptance of the terms and conditions and may result in the rejection of the offeror's entire proposal.

The solicitation also explained that "[t]his acquisition is utilizing BEST VALUE TRADEOFF Source Selection Procedures, FAR 15.101-1. As such, the Government intends to make an award to the firm that demonstrates the greatest probability of success and that will perform in a manner which will nest [sic] meet the Governments [sic] stated requirements." (capitalization in original). As noted above, once defendant decided to put the Army Combat Pants solicitation "on hold," DLA issued an amendment to the Army Combat Pants solicitation which stated:

THIS SOLICITATION IS HEREBY EXTENDED INDEFINITELY. DLA IS WAITING FOR SPECIFICATION CHANGES TO THE PURCHASE DESCRIPTION AND TECHNICAL DATA. A SUBSEQUENT AMENDMENT WILL BE ISSUED WITH UPDATED TECHNICAL INFORMATION AND A NEW CLOSING DATE WILL BE ESTABLISHED.

(capitalization in original).

As noted above, anticipation of a future procurement violation is not sufficient to make a claim ripe in a bid protest before the court. See Tenica & Assocs., LLC v. United States, 123 Fed. Cl. at 172; Brocade Commc'n Sys., Inc. v. United States, 120 Fed. Cl. at 79. Unlike the situation with the Army Hot-Weather Trousers, DLA had issued a solicitation for the Army Combat Pants. As quoted directly above, however, the solicitation has been extended indefinitely as DLA is reevaluating and changing the specifications by issuing "updated technical information" for the procurement. Although the situations in Tenica & Associates and Brocade Communications Systems differ from the situation in the above captioned protest regarding the Army Combat Pants, the determinations in both cases still provide useful guidance to evaluate if protestor's claims regarding the Army Combat Pants are ripe. In Tenica & Associates, protestor Tenica & Associates, LLC sought to challenge the Department of Defense, Defense Human Resources Activity's (DHRA) decision to allow "performance of the contract awarded to Interactive Government Holdings, Inc. (IGH), while the agency conducts a reevaluation as recommended by the Government Accountability Office (GAO)." [7] Tenica & Assocs., LLC v. United States, 123 Fed. Cl. at 168. DHRA had sought to procure support staff services for the Family Employer Programs and Policy Office, which the Judge in Tenica & Associates explained was a component of the DHRA. The Judge indicated, after award was made to IGH, GAO had recommended "that if the agency found on reevaluation that 'a proposal other than the one submitted by IGH represents the best value to the government, . . . the agency [should] terminate the contract awarded to IGH for the convenience of the government, and make [an] award to the newly-selected offeror.'" Id.

---

[7] As indicated by the Judge in Tenica & Associates, "[a]fter debriefing, several disappointed bidders (including plaintiff) challenged the contract award at GAO." Tenica & Assocs., LLC v. United States, 123 Fed. Cl. at 168.

at 169 (alternations in original) (internal refence omitted). The Judge also indicated that "[o]n July 21, 2015, in response to the GAO's decision, the Contracting Officer initiated corrective action by 'reconstitut[ing] the Technical Evaluation Board (TEB).'" Id. (internal refence omitted). The Judge further noted that "[t]o maintain support staff services for FEPP [Family Employer Programs and Policy Office] while the agency undertook the recommended reevaluation, the Contracting Officer decided, on July 22, 2015, to lift the stay put into place during the GAO protests and to allow IGH, as the contract awardee, to reinstate its work-readiness efforts." Id.

In Tenica & Associates, the Judge of the United States Court of Federal Claims held:

> The court has spoken directly to the type of challenge plaintiff makes here, stating that "[a]s a matter of law, anticipation of a future [procurement] violation is not sufficient to make a claim ripe." Brocade Commc'ns Sys., Inc. v. United States, 120 Fed. Cl. 73, 79 (2015); see also Eskridge Research Corp., 92 Fed. Cl. at 94 (citations omitted) ("A claim is not ripe where it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'") (quoting Tex. Bio– & Agro– Def. Consortium v. United States, 87 Fed. Cl. 798, 804 (2009)). But "[i]f at the end of [the reevaluation] process[,] the record shows that [the agency] did not properly carry out the corrective action by conducting a proper re-evaluation of proposals, [plaintiff] will have an opportunity to challenge the decision" the agency has made. Id. at 95. Plaintiff's expressed concerns about the agency's conduct of the reevaluation process are purely speculative, and plaintiff's complaint that "reevaluation could take forever," is contradicted by the Contracting Officer's declaration that a final decision is anticipated by the end of this fiscal year. As government officials, the Contracting Officer and agency personnel conducting the reevaluation are "presumed to act in good faith." Savantage Fin. Servs., Inc. v. United States, 595 F.3d 1282, 1288 (Fed. Cir. 2010). Absent evidence to the contrary, plaintiff's claims are merely conjectural.

> To the extent plaintiff is challenging the reevaluation process the agency has taken by relying on "speculative and potential improprieties . . . without evidence of any actual wrongdoing by [the agency]," plaintiff's protest is not ripe for judicial review. Eskridge Research Corp., 92 Fed. Cl. at 94–95. When, as here, "[p]laintiff's claims are premature, . . . the court has no jurisdiction." Brocade Commc'ns Sys., 120 Fed. Cl. at 79 (determining that the court lacks jurisdiction over speculative claims concerning the corrective action taken). Thus, plaintiff's protest as it relates to the agency's reevaluation of the submitted proposals is **DISMISSED** for lack of jurisdiction.

Tenica & Assocs., LLC v. United States, 123 Fed. Cl. at 172 (capitalization, emphasis, and alterations in original) (internal citations omitted).

In Brocade Communications Systems, Inc. v. United States, 120 Fed. Cl. 73, the United States Environmental Protection Agency (EPA) published a Request For Quotation to purchase Cisco Systems, Inc.'s manufactured switching and routing equipment, and included a "Justification In Support of Limiting the Acquisition to Cisco Products." See id. at 74. After the Request For Quotation was issued, protestor Brocade Communications Systems, Inc. (Brocade) filed first an agency level protest with the EPA, and once that was denied, an agency level appeal, a protest at the GAO, and finally, a protest at the United States Court of Federal Claims. See id. at 74-75. After the protest was filed at the United States Court of Federal Claims, the government informed the court that corrective action would be taken, and filed a notice which stated "the 'EPA has cancelled the RFQ and proposes to postpone its acquisition of network infrastructure equipment until it performs market research determining whether EPA's needs can be satisfied by products of other manufacturers, including [Plaintiff].'" Id. at 76 (capitalization and alterations in original). After the notice of corrective action was filed, the government moved to dismiss protestor's complaint, but protestor Brocade argued the court had jurisdiction over protestor's complaint until the EPA performed the corrective action. See id.

The Judge in Brocade determined that

[i]n this case, the EPA has not taken the required steps to demonstrate a final decision. First, the EPA has not made a final procurement decision, let alone a "tentative or interlocutory" one. NSK, Ltd., 510 F.3d at 1385. In fact, the EPA has not, by its own admission, even conducted the preliminary market research that will precede any procurement decision. In the absence of a final decision, no "rights or obligations have been determined" that would give rise to "legal consequences" that the court can adjudicate. Bennett, 520 U.S. at 178, 117 S. Ct. 1154 (internal quotation marks and citation omitted).

On the other hand, Plaintiff's concerns about the EPA's failure to take corrective action are speculative. As a matter of law, anticipation of a future violation is not sufficient to make a claim ripe. See Mitchell, 330 U.S. at 89–90, 67 S. Ct. 556 ("[C]oncrete legal issues, presented in actual cases, not abstractions[,] are requisite[.]"); see also Thomas, 473 U.S. at 581, 105 S. Ct. 3325 (involving "contingent future events that may not occur as anticipated, or indeed may not occur at all") (internal quotation marks and citation omitted). As such, Plaintiff's claims are premature, and the court has no jurisdiction.

Brocade Commc'ns Sys., Inc. v. United States, 120 Fed. Cl. at 79 (internal reference omitted). In both Tenica & Associates and Brocade Communications Systems, the challenge to the government's decision to take corrective action was premature, because in both instances, the outcome of the corrective action and the government's response was uncertain.

In the above captioned protest, DLA had issued a solicitation for the Army Combat Pants, and that solicitation did not contemplate Goodwill's ongoing production of the Army Combat Pants, which Goodwill now challenges. The solicitation for the Army Combat Pants that Goodwill challenges, however, is not the final version of the solicitation. As noted above, DLA issued an amendment to the solicitation which stated:

> THIS SOLICITATION IS HEREBY EXTENDED INDEFINITELY. DLA IS WAITING FOR SPECIFICATION CHANGES TO THE PURCHASE DESCRIPTION AND TECHNICAL DATA. A SUBSEQUENT AMENDMENT WILL BE ISSUED WITH UPDATED TECHNICAL INFORMATION AND A NEW CLOSING DATE WILL BE ESTABLISHED.

At this time, neither the court, nor Goodwill, can know what the final requirements for the Army Combat Pants will be or if Goodwill's position will be considered by DLA. Although the amendment refers to the purchase description and technical data, the court cannot rule out the possibility that the change in purchase description will match Goodwill's production of the Army Combat Pants, nor can the court rule out the chance that the description will be changed, and not match Goodwill's production. Although the possibility exists that the item will match Goodwill's production, and, Goodwill has alleged throughout its complaint and briefs that an award to "anyone other than Goodwill," would violate the statutory and regulatory framework of the JOWD, Tenica & Associates and Brocade make plain that the possibility of a future procurement violation is not sufficient to make a claim ripe in a bid protest before the court. See Tenica & Assocs., LLC v. United States, 123 Fed. Cl. at 172; Brocade Commc'n Sys., Inc. v. United States, 120 Fed. Cl. at 79.

Similarly, although Goodwill alleges future harm will come to protestor as a result of the failure to award Goodwill the contracts for the Army Combat Pants, until the issuance of, final version of the solicitation, the harm to Goodwill is unclear. Therefore, like the Army Hot-Weather Trousers, protestor's claims for relief for the Army Combat Pants are not ripe. Protestor's complaint must be dismissed.

Although the court has determined that the protestor's claims for both the Army Hot-Weather Trousers and the Army Combat Pants are not ripe, the court notes that once DLA issues a solicitation for the Army Hot-Weather Trousers and amends the solicitation for the Army Combat Pants, protestor should have an opportunity to bring another pre-award protest before this court. As indicated above, the court determined that the United States Court of Federal Claims has jurisdiction over the procurements by DLA.

Additionally, the court observes that Goodwill has alleged that DLA is aware of Goodwill's production of the Army Hot-Weather Trousers and the Army Combat Pants. In a declaration attached to protestor's motion for judgment on the Administrative Record by Mark Marchioli the Vice President of Business Development for Goodwill, Mr. Marchioli states that

[b]oth of these items are made for, delivered to and used by the U.S. Army. Depending on the contract, they have been paid for either with U.S. Army funds or with Defense Logistics Agency (DLA) funds. Goodwill has received Contract No. W911QY-21-C-0042, to supply the Hot-Weather Trousers. Modification No. 4 (the most recent contract modification), page 2, CLIN 0002, states "Funded by DLA." DLA's Hot-Weather Trousers Solicitation lists the same NSNs as Goodwill's Hot-Weather Trousers contract does. Hot-Weather Trousers Solicitation at 20; Contract No. W911QY-21-C-0042 at 16.

Additionally, for the Army Hot-Weather Trousers, protestor argues that

[i]n the Supply Request Package, without explanation, the line for "Mandatory Sources" is blank. "Procurement History" also is blank, even though Goodwill already had been making this item at the time, *and DLA has been paying for it*. It is not clear from the record whether this information was omitted intentionally or accidentally. There is no evidence in the record, whatsoever, that DLA ever consulted the Procurement List after receipt of the Supply Request Package, even though it was required to do so.

(emphasis in original) (internal citations omitted).

For the Army Combat Pants, protestor cites to an email chain included in the Administrative Record between DLA and a Vice President of SourceAmerica about the production of the Army Combat Pants for DLA which includes a discussion of the Procurement List and Goodwill's production of the Army Combat Pants. Beginning in the email dated June 8, 2020, Jill Johnson, a Vice President of SourceAmerica, reached out to Kevin Peoples at DLA and stated:

Hi Kevin,

Hope you had a great weekend!

Thank you so much for your call last week. Per our conversation, I would like to confirm the following:
1. DLA Troop Support would like to add 30% of the Army Combat Pant Requirement to the Procurement List.
2. There have not been previous commercial purchases (outside of AbilityOne) for the Army Combat Pant.
3. The NSNs that you are seeking to purchase are attached.
Once we have your confirmation, we can begin the expedited Procurement List addition process.

Let me know if you have any questions.

Jill Johnson

Mr. Peoples responded on June 19, 2020 and stated:

> As we discussed yesterday, we had conducted market research that revealed commercial market pricing is significantly below your current contract prices with Natick which are about $[redacted] per garment. Those commercial acquisition plans were already in circulation with total maximum of 256K for the base year and 359K maximum for the option years. We have reduced stated minimum and Estimated buy quantities from those acquisition [sic] so that we could solicit and potentially award to you for up to 30% of those maximums or 76,800 for the base year and up to 107,700 for the option years; presuming we can come to price agreement. Your minimums and estimated quantities would also be about 30% of our commercial buy. However, given the price disparity I do not want you adding DLA to your procurement list until after we are able to have an opportunity to review your offer and find it fair and reasonable. If we are unable to find your offered prices fair and reasonable after we solicit and review, we are retaining the maximums under those commercial acquisitions so that we can cover all requirements under those acquisition [sic] if need be without being locked into the procurement list. If we are able to come to price agreement we can then proceed with having DLA added to the procurement list for 30% of the requirement and have the prices we negotiated review and approved by the Commision. [sic]

> Let me know if you have any questions.

> Kevin

On June 23, 2020, Ms. Johnson responded:

> Hi Kevin,

> SourceAmerica met with Goodwill and ReadyOne to discuss the possibility of providing the ACP at a lower price point when it transitions to sustainment.

> Both NPAs are beginning the process to refine their price. We have several questions prior to finalizing a price to submit to you:

> 1. A new design for this garment is currently in development. The new design does not include the Propel material which is sole source and expensive. Can you provide the technical data for the pants you are posting in your solicitation so we can ensure that we are developing the appropriate comparison price?
> 2. Both Tencate and Milliken are approved to provide the base material. The NPAs requested confirmation that they can source from either and that they are not required to source from Tencate only.

3. Will permethrin treatment be required? The Army recently indicated that they may require this in the future.
4. If the garment requires Propel fabric, the lead time for that fabric is 180 days. This would push out the PLT for the item. Additionally, another 30 days is required for permethrin treatment.

I will also give you a call to see if you have any questions. The NPAs believe they can have updated pricing a week or two after they have the confirmed tech data.

Jill Johnson

For both the Army Hot-Weather Trousers and the Army Combat Pants it appears that DLA was aware of, or should have been aware of, Goodwill's production of the items to be procured, and that the items Goodwill produced were on the Procurement List. The court notes, however, neither the solicitation for the Army Combat Pants, nor the Individual Acquisition Plans for both the Army Combat Pants and the Army Hot-Weather Trousers mentioned or addressed Goodwill's production of the Procurement List items. If and when DLA issues the solicitation for the Army Hot-Weather Trousers, or issues the revised version of the solicitation for the Army Combat Pants, DLA should consider addressing if the items are on the Procurement List, and any role Goodwill may had or has in producing the items to be procured by DLA.

In addition, both DLA and Goodwill should further consider the percentages referenced in the Administrative Record for Goodwill's production of the Army Hot-Weather Trousers and the Army Combat Pants. As noted in the findings of fact, there are numerous references to Goodwill's production a percentage of the Procurement List items. For example, the September 12, 2011 Notice of Change to Procurement List provided, in part:

> Coverage: C-List for 50% of the requirement of the U.S. Army, as aggregated by the Army Contracting Command – Aberdeen Proving Ground, Natick Contracting Division, Natick, MA
>
> ReadyOne Industries, Inc., El Paso, TX, a nonprofit agency associated with NISH, is authorized to accept orders from the Army Contracting Command – Aberdeen Proving Ground, Natick Contracting Division, Natick, MA for its requirement for the products listed above.
>
> Goodwill Industries of South Florida, Inc., Miami, FL, a nonprofit agency associated with NISH, is authorized to accept orders from the Army Contracting Command – Aberdeen Proving Ground, Natick Contracting Division, Natick, MA for its requirement for the products listed above.
> Prices are effective on the date of this Notice and apply to any orders received by the nonprofit agencies on or after those dates. Future prices will be determined according to the price change mechanism indicated.

Also, the June 2020 emails between Jill Johnson, a Vice President of SourceAmerica and Kevin Peoples at DLA contemplated a 30% production of the Army Combat Pants by Goodwill. Although not included in the email chain, Goodwill argued in a footnote to its motion for judgement on the Administrative Record that

> [t]o the best of Goodwill's knowledge, Goodwill actually fulfills all of the U.S. Army requirements for this item, not 50%. Goodwill is not aware of any existing commercial supplier, and the administrative record indicates that there isn't one. As seen below, there are several points in the record, like this one, where a 50% set-aside or a 30% set-aside is discussed. As noted, these appear to be efforts by SourceAmerica to compromise on the issue. Goodwill's position is different, *i.e.,* as a matter of law, by statute, regulation and controlling precedent, when an item is on the Procurement List, there is a 100% set-aside throughout the Federal Government.

Specifically regarding the June 2020 emails, again in a footnote, Goodwill stated:

> SourceAmerica's statement notwithstanding, and at the risk of repetition, Goodwill's position (as supported by ample controlling legal authority) is that once an item is on the Procurement List, it is 100% set aside, not 50% set aside or 30% set aside. Goodwill believes that such statements have been colored by the fact that DLA has repeatedly ignored the Procurement List; SourceAmerica may be of the view that half a loaf is better than none.

As noted above, in the above captioned protest, and likely in any future protest, Goodwill seeks, or will seek, to "enjoin the award or continued performance of any federal contract or contracts, or the modification of any federal contract or contracts, awarded to, or performed by, entities other than Goodwill, for the production (in whole or in part) of military equipment items known as" Army Combat Pants and Army Hot-Weather Trousers. Therefore, the issue of percentages for any set aside for the Army Combat Pants and Army Hot-Weather Trousers might require further clarification by DLA.

## CONCLUSION

As discussed above, and, after careful consideration of the issues presented, the court concludes that protestor's claims are not ripe at this time. Protestor's complaint is **DISMISSED**, without prejudice. The Clerk of the Court shall enter **JUDGMENT** consistent with this Opinion. If Goodwill should file another bid protest for the Army Combat Pants or Army Hot-Weather Trousers solicitations issued by DLA, the Clerk's Office shall waive the filing fee.

**IT IS SO ORDERED.**

<u>s/Marian Blank Horn</u>
**MARIAN BLANK HORN**
**Judge**